UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
ANTHONY COOPER,                         )
                                        )
        Petitioner,                     )
                                        )
            v.                          )        Civil Action No. 09-10743-GAO
                                        )
KARIN T. BERGERON,                      )
                                        )
        Respondent.                     )
_____)


REPORT AND RECOMMENDATION ON
PETITION FOR WRIT OF HABEAS CORPUS.

July 3, 2012


SOROKIN, C.M.J.

        On May 7, 2009, Anthony Cooper petitioned for a writ of habeas corpus pursuant to 28

U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996

(AEDPA). (Docket No. 1). The Respondent opposes the Petition. (Docket No. 8). Pursuant to an

Order of Reference dated November 22, 2010, I recommend that the Petition be DENIED.

Additionally, I DENY the Motion for Hearing on the Petition (Docket No. 23) without prejudice to

its renewal before the district judge.

I.      PROCEDURAL BACKGROUND

        On February 11, 2003, after a jury trial before Massachusetts Superior Court Associate

Justice Mitchell Sikora, Cooper was found guilty of armed robbery in violation of M.G.L. c. 266,

§ 14 and armed robbery in violation of M.G.L. c. 265, § 17. After denying Petitioner's motion for

required findings of not guilty, the Court, after a jury-waived trial, found Petitioner guilty of being

a habitual offender on both indictments. He was sentenced to concurrent terms of life in prison at

MCI-Cedar Junction on each indictment.

Petitioner filed a timely notice of appeal. He also filed a motion for a new trial which was

denied. He appealed from this judgment; the Appeals Court consolidated his two appeals. Three

of the six claims he raised on appeal were: (1) that it was error to admit a voice identification as

evidence because it was impermissbily suggestive; (2) that the trial court erred in denying

Petitioner's motion to suppress his statement to the police because it was involuntarily made; and

(3) that trial counsel's failure to move to suppress recorded prison phone calls as violative of the

Massachusetts wiretap statute, M.G.L. c. 272, § 99, constituted ineffective assistance of counsel.

The Appeals Court affirmed Petitioner's convictions. The Supreme Judicial Court denied

Petitioner's timely application for further appellate review. This petition timely followed.

## II.    FACTUAL BACKGROUND

The following recitation of the facts by the Appeals Court is presumed to be correct. See 28

U.S.C. § 2254(e)(1); Gunter v. Maloney, 291 F.3d 74, 76 (1st Cir. 2002).

> In February, 2002, the victim fell asleep watching television and awoke in the
> middle of the night to find someone standing over her, putting his gloves over her
> eyes. She briefly saw dark clothing, gloves, and a hat. The man said three times,
> "Don't get up. Don't move, I have a knife." He asked her twice if she was okay, and
> he put a shawl over her eyes. When he asked if she had any money, she responded
> "yes," pointed toward her handbag, and said "on my bed." When asked the color of
> the handbag, she responded "black." He said, "Don't move, don't look up." He
> retrieved the bag and then returned. When he asked her name, she stated "Julie." He
> rubbed her right leg with his hand and said, "Julie, you're very pretty, you have a
> nice body." Scared, the victim said "No, please just leave," and [Cooper] responded
> "okay, I'm leaving. Don't get up, don't call the police, I'll be watching you through
> the window." The victim next heard footsteps heading toward the door as [Cooper]
> was leaving. The entire incident lasted less than a minute, and the victim heard
> [Cooper's] voice for a total of forty-five seconds.

The victim called the Hingham police immediately, who arrived within twenty seconds at 1:54 A.M. They said that a car in the area "did not belong" but did not say to whom it belonged. After bringing her to the car, she found her black handbag with its contents spilled on the pavement next to the car and two one hundred dollar bills missing. Inside the car, the victim saw her checkbook and portfolio case, which had been in her handbag, as well as gloves and a knit hat that the intruder had worn.[1]

Later that day, a male caller, who identified himself as [Cooper], reported his car as stolen to local police. The telephone call was transferred to the Hingham police station, and Lieutenant Mills of the Hingham police suggested that he come to the police station. When the caller asked whether he should bring a lawyer with him, Lieutenant Mills laughed and responded that given his lengthy criminal record, he should.

The next day, the victim brought her handbag and telephone to the police department to be used as evidence. While there, Detective McInnis asked the victim to listen to a 911 tape of a stolen car report. The detective did not inform the victim of its connection to her case or whose voice was on the tape, and, at the detective's suggestion, the victim listened to the tape with her eyes closed. She immediately recognized the caller's voice as the intruder, opened her eyes, and said "That's him, that's the guy." During his testimony, the detective said that the victim was shaking when she said "That's the guy that was in my house."

*Motion to Suppress: Statements*

After the identification, [Cooper's] parole officer obtained a parole violation warrant and arrested [Cooper]. The parole officer and the detective were both present when [Cooper] was read his Miranda rights and signed the booking form. The detective told [Cooper] that he would like to speak with him, and [Cooper] agreed. The detective specifically asked whether he was represented by an attorney whom he had contacted after reporting the stolen car, and [Cooper] responded negatively, saying he wanted a lawyer "closer to home." As the motion judge found, the attorney never spoke to [Cooper] again, was not retained by him, and did not file an appearance in court. The detective testified that he would not have interviewed [Cooper] if he had been represented by counsel.

Before interviewing him, the detective administered the Miranda warnings again and asked [Cooper] if he understood them; [Cooper] agreed. The detective

---

[1] The court noted that Cooper stipulated that DNA taken from the hat matched his DNA. Commonwealth v. Cooper, 71 Mass. App. Ct. 1102, 2007 WL 4571178, at *1 n.1 (Dec. 31, 2007).

then interviewed [Cooper], who was not handcuffed, in an interview room for approximately twenty minutes. The motion judge found that, at some point, the detective told [Cooper] that "if he did not speak with him, [the detective] would see to it that D.S.S. [would take] his son away from his ex-wife." [Cooper] provided a self-serving statement amounting to an alibi claim that he was with his friend, Richard Parker, on the night of the incident. [Cooper's] answers were coherent and detailed, and he did not appear or indicate that he was tired.

[Cooper] called Parker from prison, on a recorded call, and told him to "stick to the story" and that he would write it down and send it to him. He wrote Parker a few letters. During one conversation, Parker said "I'll call your lawyer. What do you want me to say?" [Cooper] instructed Parker to say, "I'm Tony's witness and he was with him."

*Trial*.

In addition to the same testimony provided during the suppression hearing, Lieutenant Southard of the Hingham police department testified about the police department's policy to record all 911 calls. The 911 tape from the victim to the police was played for the jury.

Sergeant Shaw, the Hingham K-9 officer, testified that, after smelling the victim's shawl, the dog tracked "strongly" to a black car in the parking lot. He identified a photograph of that car and its license place number (exhibit 16). A copy of the car's registration, which states that it was registered to [Cooper] and lists the same license place number, was also introduced into evidence.

Pursuant to subpoena, Parker, a cocaine addict, testified that he met [Cooper] seven years earlier and rode in [Cooper's] Oldsmobile, which he identified as the car depicted in exhibit 16. He testified that, the morning after the incident, [Cooper] called him to inform him of the ruse where [Cooper] had stayed at Parker's house the previous night, slept on his floor, and that his car was stolen from Parker's house. This call was recorded, and Parker identified the voices on the tapes as those of himself and [Cooper]. Since this call, Parker and [Cooper] had "three or six" additional phone conversations, all of which were recorded. Although he could not specifically remember which call, he recalled [Cooper] telling him to "stick to the story."

The court issued findings of fact in which it found that [Cooper] had been convicted of seven prior offenses, receiving at least three years in State prison on each of them. The court also found that [Cooper's] identify [sic] had been proven by the testimony of the parole officers and fingerprint evidence. The court took judicial notice of his conviction of the charges in the preceding jury trial and found him guilty on the portion of both indictments charging him with being a habitual

offender.

Commonwealth v. Cooper, 71 Mass. App. Ct. 1102, 2007 WL 4571178, at *1-3 (Dec. 31, 2007).

III.     DISCUSSION

A.  Habeas Corpus Standard of Review

Cooper cannot obtain federal habeas relief under 28 U.S.C. § 2254(d)(1) unless he can show that the Massachusetts courts' decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." "A legal principle is 'clearly established' within the meaning of this provision only when it is embodied in a holding of [the United States Supreme] Court." Thaler v. Haynes, 130 S. Ct. 1171, 1173 (2010).

The "contrary to" prong is satisfied when the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different] result." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). The "unreasonable application" prong is satisfied if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Moreover, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

B.     Voice Identification

Cooper claims a violation of his constitutional right to due process secured by the Fifth and Fourteenth Amendments by the admission of the victim's voice identification arising out of an impermissibly suggestive identification procedure.  Cooper raises three issues on this claim:  he challenges the Appeals Court's factual determinations as unreasonable; he contends that the Appeals Court's conclusion that the identification was not unreasonably suggestive was a violation of clearly established Supreme Court precedent; and he argues that the admission of the identification evidence had a substantial and injurious effect on the verdict.

In order to set aside the Appeals Court's findings, Cooper must establish that there was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  Moreover, the state court's factual findings "shall be presumed to be correct," and Cooper bears the burden of disproving the factual findings by clear and convincing evidence and demonstrating that the findings are "objectively unreasonable."  Evans v. Thompson, 465 F. Supp. 2d 62, 75 (D. Mass. 2006) (citing Miller-El v. Cockrell, 537 U.S. 322, 341 (2003)).

Insofar as Respondent seems to contend that Cooper cannot bear his burden of proof merely by playing the tape and arguing that the Appeals Court's factual conclusions are objectively unreasonable in light of the totality of the evidence (see Docket No. 20 at 11), the Court disagrees.  See Wiggins v. Smith, 539 U.S. 510, 528-29 (2003).  Nonetheless, the Court agrees with Respondent that Cooper has not met his burden of proof.

1.     The Facts

First, Cooper contends that the Appeals Court made erroneous factual determinations that

fail to withstand scrutiny even under the deferential standard applied in this proceeding. Specifically, Cooper seems to contend that the Appeals Court determined that the victim, during the voice identification, did not listen to the first part of the tape. (Docket No. 18 at 6 ("The court concluded that the beginning portion of the 911 tape which the victim heard was not improperly suggestive . . . . The court did not describe what could be heard on the beginning portion of the tape.")). After a careful review of the tape and the record, I recommend that the Court determine that the Appeals Court did find that the victim heard the first part of the tape.

The Court has the tape from the state court[2] and has listened to it. The tape the Court has contains the recording of two separate phone calls, both recorded on February 18, 2000. (Audio Tape: 2/18/2000). The first recording on the tape begins with Quincy police calling Hingham police (while, according to the Quincy officer making the call, Cooper is "on the phone with [Quincy] right now saying he left his keys in his car and now it's not there"). (Id.; S.A. 164). During this Quincy police to Hingham police phone call, Cooper says "there is derisive laughter heard in the background," when the Quincy officer reports that Cooper claims that he left his keys in the car, and that Lieutenant Mills' "tone of voice while speaking with the Quincy Police Department [is] sarcastic and disbelieving." (Docket No. 18 at 9). Indeed, when Quincy reports that Cooper is on the phone reporting that "he left his keys in his car and someone took it," Lieutenant Mills sarcastically responds, "What do you know." (Audio Tape: 2/18/2000; S.A. 165). The Quincy officer replies, "I know, huh, coincidence, isn't it." (Id.). Lieutenant Mills goes on to comment, in

---

[2] The tape bears two exhibit labels ("B-ID" and "14"). The label on the cassette tape box says, "Victim - ID'D Voice of Defendant" along with a case number and a date of "2/18/2000." It was produced to this Court on November 6, 2009, per a request from Judge O'Toole, according to the receipt. Hereinafter, the tape will be cited as "Audio Tape: 2/18/2000."

mock disbelief, "Yeah, geeze, I'm really shocked! I'm just shocked it took him so long to call it in, I had a couple of conversations with his wife over that, she had no idea where he was . . . ." (Id.). Cooper contends that these comments are derisive of his report of a stolen car and unduly suggestive. At the end of the exchange between Lieutenant Mills and the Quincy officer, Mills asks Quincy police to "suggest to [Cooper] strongly that he come to the Hingham Police and have some discussion with us this morning." (Id.). At this point, the first phone call on the tape ends. No person other than the police officers are heard on this first recording on the tape, i.e., neither Cooper nor any other person other than the police officers speak during this first portion of the tape. (See Audio Tape: 2/18/2000; S.A. 164-65).

A period of silence or static follows the conclusion of the first phone call on the tape until a listener hears the recording of a second phone call. (Audio Tape: 2/18/2000). This call is Cooper's follow up call to the Hingham Police per Hingham's instructions relayed to Cooper by Quincy Police. During this second telephone call, Cooper speaks first with the dispatcher, explaining "I was just told to call down there . . . my car was stolen last night in Quincy . . . and they said that Hingham police want to talk to me." (Id.; S.A. 165-66). Near the conclusion of the Cooper-Mills conversation, Lieutenant Mills suggests that Cooper "come down and talk to [the Hingham Police], and think about [his] story before" he gets there. (Audio Tape: 2/18/2000; see also S.A. 167). Mills tells Cooper to bring a lawyer if he has one. (Audio Tape: 2/18/2000; S.A. 167). When Cooper asks why he should bring a lawyer, Mills, laughing, says "Ha, ha, well that's because I don't think you want to talk to us without one, with your record I think you need to have one." (Id.). The phone call then concludes. Cooper also claims these comments are derisive and unduly suggestive.

8

The Superior Court heard the following evidence and argument regarding the cassette tape containing these recordings and the voice identification of Cooper that the victim made after hearing the recording.

The victim testified at the hearing on Cooper's Motion to Suppress that the "first thing" she recalled "hearing on the tape recording" was "[t]he police dispatcher answering the phone." (S.A. 1568). She then testified that she recalled hearing the dispatcher's words on the tape for "not long – five seconds . . . at most," and that "at some point" she heard somebody else on the tape speaking. (Id. at 1568-69). The victim stated that she "recognized the voice immediately when [she] heard it as being the same voice that was in [her] condo . . . ." (Id. at 1569). She testified that she "really just focus[ed] on the sound of the voice that [she] was listening to" and recalled none of the particular words that she heard, but rather "[j]ust the general nature of the conversation." (Id. at 1570). The officer conducting the identification, according to the victim, continued to play the tape "not very long" after her identification, "[p]robably a couple of seconds." (Id.). Well prior to the identification procedure, the victim had told the police that she would "definitely recognize" the perpetrator's voice. (Id. at 1572).

Prior to listening to the tape, the victim was told that Detective McInnis wanted her to listen to the tape, but "didn't really tell [her] a purpose. He just said the tape was of someone calling in their car stolen to the police." (Id. at 1595). However, Detective McInnis did not tell the victim that this was "the same motor vehicle that was found in [her] complex that evening." (Id. at 1598). The victim testified that, to her recollection, she did not "make that connection." (Id.). Although the victim testified that she did not recall hearing "some communication between the Quincy Police Department and the Hingham Police Department," (id. at 1599), she testified that she heard the

"portion of the tape . . . with the police sort of laughing and joking around."  (Id. at 1602).  She also

testified that she had heard "the name Anthony Cooper," and "some discussions about the guy's wife

being called and the guy's wife not knowing where he is," and that this was "information that [she]

heard prior to hearing any voice."[3]  (Id. at 1602-03).  The victim also stated that when Detective

McInnis played the tape for her at the police station, "he played it straight through . . . he did not

break it up . . . [and] when the tape started, it played through . . . to when he stopped it."  (Id. at

1601-02).  At the end of her testimony, the victim testified as follows:

> Q: Let's just say when you listened to the first portion of the tape, prior to it getting
> to the voice, you knew that the police had somebody on the line who had been
> involved in a motor vehicle missing, right?
>
> [Victim]: Yes.
>
> Q: You knew that the person's name was now made known to you as Anthony
> Cooper, right?
>
> [Victim]: Yes.
>
> Q: You also knew that the police – the Hingham Police had made contact with
> Anthony Cooper's wife and that she could not explain why he was not home, right?
>
> [Victim]:  Yes.
>
> Q: And you also could tell from the tone of voice of – certainly from the Lieutenant
> from the Hingham Police Department – that he did not believe anything that had
> been conveyed to the Quincy Police Department.  You got that sense from listening
> to the tape, right?
>
> [Victim]: Yes.

(Id. at 1608).  In sum, the victim agreed that she heard what is the substance of the Quincy to

---

[3] From listening to the tape, and reading the transcript of the taped conversations, it is
clear that these facts could only be part of the first recorded phone call; the name Anthony
Cooper and the discussion regarding his wife come up only in the first call, between Hingham
Police and Quincy Police.  (See Audio Tape: 2/18/2000; S.A. 164-65).

Hingham Police phone call prior to hearing the voice she identified. (Id.).

After the victim testified, Detective McInnis, the officer who performed the voice identification, testified. Initially, he testified that he started playing the tape for the victim not from the beginning of the tape, but rather, "at the beginning of the Hingham call . . . right after it says, Quincy, bye, bye. And then [the transcript] says, New Call." (Id. at 1621-22). He then confirmed that he started the tape "where it says, Dispatcher and Cooper." (Id. at 1622). However, after Assistant District Attorney Glenn A. MacKinlay refreshed the detective's recollection with his report, (id. at 1623-24), the detective testified differently. He stated that he "must have played the tape right from the beginning. Right from the beginning of the tape . . . start[ing] with the Quincy call." (Id. at 1624). Correcting himself, the detective testified as follows:

Q: So your testimony is you didn't start with Cooper on Page 2 where Cooper starts speaking on the transcript?

[Detective]: No. I think I started with the Quincy call.

(Id. at 1624). The detective also reported that after the victim made her identification, "[s]he was shaking." (Id. at 1626).

At the end of the hearing on the Motion to Suppress, the Motion Judge stated, "The issue is what she heard, and I think from the witnesses there's not much dispute that she heard it from the beginning." (Id. at 1641). The Motion Judge then framed the dispute: "The issue is whether or not the discussion between police officers about the conversation of the wife and their opinions about the caller's credibility is suggestive." (Id.).

During argument, the Commonwealth never disputed that the officer played the tape from the beginning: "the police could have done this better. They could have not played that part that has comments in there that are not appropriate." (Id. at 1644). In response to a question from the

Motion Judge focusing on the issue Cooper raises – "that's the real problem . . . They have talked to his wife and she had no idea where he was," the Commonwealth conceded that "the contents of it is an issue," and defended the admissibility of the victim's voice identification based on the tape, notwithstanding the comments of Lieutenant Mills on the first portion of the tape. (Id. at 1646-47). However, the Commonwealth did not dispute that the victim heard those statements. (See id. at 1648 ("I would be in better footing if the police hadn't played that particular section to the witness.")).

The Superior Court took the matter under advisement. In a subsequent written decision denying the motion to suppress the identification, the Motion Judge described the call to Hingham Police, stating:

> On that same day, February 18, 2000, at approximately 8:00 a.m., a male caller telephoned the Hingham Police Department to report a stolen vehicle. The police received the call on a recorded line. The caller indicated that the Quincy police told him to call . . . . When [the victim] arrived at the Hingham police station, she met with Hingham Police Detective Gerald McInnis . . . . Detective McInnis brought [the victim] into a room, told her that he had a tape recording, and asked her to listen to it . . . . [The victim] listened to a tape-recorded conversation of someone calling the Hingham police station to report a stolen car. [She] recognized the voice on the tape as the voice of the man who broke into her apartment . . . . [She] told Detective McInnis, "That's him."
>
> Prior to listening to the tape, Detective McInnis never mentioned that the tape was of [Cooper] or that the police had arrested the individual on the tape. Detective McInnis did tell her that the tape recorded someone reporting his car stolen. At some point, Detective McInnis also mentioned to [the victim] that the individual placed the call to the Quincy Police Department.

(S.A. 169-70). The Motion Judge omitted any discussion or analysis of the significance, if any, of the earlier portion of the tape containing a recording of the conversation between Quincy and Hingham Police. The Motion Judge concluded "that the voice identification procedure used by the Hingham police was not unnecessarily suggestive nor did it violate [Cooper's] due process rights."

(Id. at 173).

In his appeal, Cooper sought review of the decision denying his motion to suppress. The Appeals Court stated that Cooper "contend[ed] that the police officers' laughter in the background of the 911 call was excessively suggestive and conducive to mistaken identification." Cooper, 2007 WL 4571178, at *3. The Appeals Court found that "there is no disputing that the end of the tape contains laughter by Lieutenant Mills regarding [Cooper's] lengthy record and need for counsel." Id. However, quoting the motion judge, the Appeals Court also found that "[the victim] never actually heard Lieutenant Mills' statements because she identified [Cooper's] voice prior to reaching that portion of the tape." (Id.; see also S.A. at 170 n.1). These findings are plainly references both to Mills' laughter near the end of the second call and Mills' comments about Cooper obtaining a lawyer, also at the end of the second call. (See Audio Tape: 2/18/2000). All of the foregoing came after the exchange between Cooper and the officer. Cooper appears to accept this finding; in any event, he has failed to establish that it is an unreasonable one, as both the victim and the detective testified that the detective turned the tape off prior to these statements. (See S.A. 1607 (testimony of victim); 1625-26 (testimony of the detective)).

But, Cooper seems to claim the Appeals Court's findings are clearly unreasonable regarding a different portion of the tape. Specifically, he contends that earlier on the tape during the first call (when Quincy called Hingham), Mills laughed and spoke disbelievingly regarding the caller's report of a stolen car. (Docket No. 18 at 9). The Appeals Court, in its opinion, stated that it "listened to the entire 911 tape, including the beginning portion of the tape that the victim actually heard," and then determined "that there was nothing improperly suggestive when the 911 call was transferred between police officers." Cooper, 2007 WL 4571178, at *3 n.2. The Appeals Court also "agree[d]

that the better practice would have been to advance the tape to where the intruder's voice begins so as to avoid superfluous conversations." Id.  Here, the Appeals Court found that the victim heard the cassette tape from the beginning, i.e, including the Quincy to Hingham phone call.  The record amply supports this finding.  Cooper's contention that the victim did hear the tape from the beginning is not at odds with these findings. [4]

2.      The Voice Identification Findings

While noting that the police officers did not follow the best practice, the Appeals Court upheld the admission of the voice identification made by the victim, stating:

> Having listened to the entire 911 tape, including the beginning portion of the tape that the victim actually heard, this court concludes that there was nothing improperly suggestive when the 911 call was transferred between police officers.  Nevertheless, we agree that the better practice would have been to advance the tape to where the intruder's voice begins so as to avoid superfluous conversations.

Cooper, 2007 WL 4571178, at *3 n.2.

In Stovall v. Denno, 388 U.S. 293, 302 (1967), the Supreme Court established that due process can be violated by highly suggestive identification procedures, but stressed that such procedures must be evaluated in light of the totality of circumstances.  A pre-trial identification may violate due process when it is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968) (defining this standard as a fact-specific totality of the circumstances test).  The critical factor in analyzing the suggestiveness of an identification procedure is the identification's reliability.

---

[4] While the Respondent vigorously defends the Appeals Court's decision, Respondent never clarifies expressly whether she believes the Appeals Court's findings regarding the portion of the tape the victim heard encompass or exclude the first phone call on the cassette tape.  (See Docket No. 20 at 11 (describing the beginning portion of the tape)).

Manson v. Brathwaite, 432 U.S. 98, 114 (1977). The reliability determination must consider:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

In the First Circuit, courts employ a two-step analysis in determining whether a pre-trial identification procedure violates due process. United States v. DeCologero, 530 F.3d 36, 62 (1st Cir. 2008); Wright v. Marshall, No. 98-10507-PBS, 2009 WL 3764024, at *6-7 (D. Mass. Nov. 9, 2009) (Saris, J) (applying the two-pronged analysis to a voice identification). At the first step, the Court asks "whether there was an impermissibly suggestive procedure." United States v. Henderson, 320 F.3d 92, 100 (1st Cir. 2003). This inquiry "can be broken down into two constituent parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures." United States v. Holliday, 457 F.3d 121, 125 (1st Cir. 2006) (quoting 2 W. LeFave, Criminal Procedure 668, 2d Ed. (1999)).

If the Court finds an unnecessarily suggestive procedure, it then "must decide whether the identification itself was reliable under the totality of the circumstances, notwithstanding the suggestive procedure." United States v. Watson, 76 F.3d 4, 6 (1st Cir. 1996)). This second step incorporates the Supreme Court's multi-factor analysis from Biggers. See DeCologero, 530 F.3d at 62. Finally, the Court must bear in mind that "identification evidence . . . should be suppressed as a matter of due process 'only in extraordinary cases.'" Holliday, 457 F.3d at 125 (quoting Henderson, 320 F.3d at 100).

Cooper argues that the Appeals Court's finding that the first phone call is not unduly suggestive is unreasonable as a matter of fact and an unreasonable application of existing Supreme

Court precedent. (See Docket No. 18 at 6 & 12). Cooper alleges suggestiveness in two respects: that the detective played an irrelevant portion of the tape containing statements by officers deriding Cooper and that the detective conducted the equivalent of a showup by presenting the victim with only Cooper's voice to identify. (Id. at 12).

There is no dispute that the playing of the first phone call on the tape, the one between Quincy and Hingham officers, was exceedingly poor police procedure. Nothing said in that phone call bore on the voice identification procedure. The effort and complexity involved in cuing the tape to the proper section would have been minimal. Hence, the Appeals Court concluded that "the better practice would have been to advance the tape to where the intruder's voice begins so as to avoid superfluous conversations." Cooper, 2007 WL 4571178, at *3 n.2. Nonetheless, the Appeals Court concluded that the victim's identification of Cooper's voice "stemmed directly from her recognition of his voice" on the tape as opposed to some other reason such as improper suggestion arising from hearing the beginning portion of the tape. Id. at *3. The Appeals Court did not conclude, as Cooper tries to suggest, that the voice identification procedure was a model of best practices free of any improper or unintended suggestion. Rather, it determined that the identification rendered by the victim was untainted by the police procedures. Id. This determination survives habeas review.

Under governing Supreme Court law, identifications violate due process when they are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons, 390 U.S. at 384. As found and determined by the Appeals Court, the victim listened to the tape without any knowledge that (a) the police had already arrested the speaker

and (b) the speaker was Cooper.[5]  Cooper, 2007 WL 4571178, at 3.  The detective did not coach,

coax, or instruct the victim toward an identification.  No one told the victim that the police had

concluded the speaker was the intruder in her home.

Assuming the identification process was impermissibly suggestive, the apparent assumption

of the Appeals Court, the conclusion that the victim's identification was nonetheless "reliable under

the totality of the circumstances,"[6]  Watson, 76 F.3d at 6, does not transgress the applicable federal

law.  While the victim's discussion with the intruder was relatively short, it included a number of

back and forth exchanges, in a circumstance in which you could expect that her attention to the

intruder's voice was heightened – she was in the dark with her eyes shut focused solely on the

---

[5]  Cooper asserts that the Appeals Court mischaracterized the record with respect to the date of Cooper's arrest.  (Docket No. 18 at 6).  In its recitation of the facts under the section "*Motion to Suppress: Statements*," the Appeals Court states "After the identification, [Cooper's] parole officer obtained a parole violation warrant and arrested the defendant."  Cooper, 2007 WL 4571178, at *2.  However, in the portion of the opinion discussing whether the voice identification was impermissibly suggestive, the Appeals Court states, "As the motion judge found, before the victim listened to the tape, the detective never mentioned that the tape was of [Cooper] or that the police had arrested the individual on the tape."  Id. at *3.  Regardless, the Appeals Court found that "the victim's identification was based solely on her recognition of the intruder's voice."  Id.

[6]  Cooper argues that the Appeals Court never reached the reliability question and, therefore, de novo review applies to this aspect of the decision.  (See Docket No. 18 at 5 (citing Wright v. Marshall, No. 98-10507-PBS, 2009 WL 3764024, at *2 (D. Mass. Nov. 9, 2009) (Saris, J)).  However, "[i]t is the result to which [the Court] owe[s] deference, not the opinion expounding it."  Clements v. Clarke, 592 F.3d 45, 55-56 (1st Cir. 2010).  AEDPA deference "applies regardless of the procedures employed or the decision reached by the state court, as long as a substantive decision was reached[.]"  Teti v. Bender, 507 F.3d 50, 57 (1st Cir. 2007) (emphasis in original).  Although the Appeals Court did not expressly discuss the reliability prong, it did find that "viewing the totality of the circumstances, the 911 call reporting the stolen car was properly admitted because the victim's identification was based solely on her recognition of the intruder's voice, with no possible improper suggestions by any police officers," Cooper, 2007 WL 4571178, at *3, and, therefore, AEDPA deference applies to the reliability question.

intruder. In addition, the traumatic nature of the experience would fix the details of the experience in the victim's mind. Accordingly, the Appeals Court's decision rejecting this due process claim was neither contrary to, nor an unreasonable application of, federal law. In addition, it is not tainted by any clearly erroneous factual findings.

C.    Miranda

Cooper contends that the trial court unreasonably applied Supreme Court authority to the facts of his case, thereby violating his constitutional right to due process secured by the Fifth and Fourteenth Amendments, when it denied the motion to suppress his statement to the police on the grounds that the statements were not voluntarily made. (Docket No. 18 at 19). Specifically, Cooper "contends that his statement was involuntarily made because of the coercive effect of the detective's threat that the Department of Social Services would take his son away if he refused to talk with him." Cooper, 2007 WL 4571178, at *4. Cooper also argues that the Massachusetts courts improperly relied on the fact that his statement was self-exonerating in finding it voluntary.[7] (Docket No. 18 at 23). Cooper argues that the due process violation was substantially injurious to the verdict in that it led police to evidence against Cooper, namely Parker and the recorded conversations with Parker which the Commonwealth argued at trial should be interpreted as coaching Parker to lie, and also because the Commonwealth used Cooper's statement to support an inference of guilt as the prosecution argued at closing that Cooper's statement and the evidence obtained from it were powerful corroboration. (Docket No. 18 at 25).

The Appeals Court found that:

The judge here appropriately "considered factors relevant to the totality of the

_____

[7] Respondent does not directly address this argument in her opposition brief.

circumstances, including 'whether promises or other inducements were made to [Cooper] by the police . . . [Cooper's] age, education and intelligence . . . his experience with the criminal justice system . . . his physical and mental condition . . . whether he was under the influence of drugs or alcohol . . . and the details of the interrogation, including the recitation of Miranda warnings . . .' (citations omitted)." Commonwealth v. Scott, 430 Mass. 351, 355 (1999). The motion judge correctly denied the motion to suppress because, based on the totality of the circumstances, [Cooper] received at least three Miranda warnings prior to talking with the detective, denied that he was represented by counsel and indicated that he was going to hire a lawyer "closer to home," provided a self-serving statement concerning his alibi, acted normally and calmly when arrested, and was a "seasoned career criminal unlikely to succumb to fear and intimidation." Further, although "[c]oncern for a loved one may, in certain circumstances, render a confession involuntary," ibid.; see Commonwealth v. Berg, 37 Mass. App. Ct. 200, 206 (1994), this "record is devoid of any unfair tactics, illegitimate police conduct, or psychological coercion." Commonwealth v. Scott, 430 Mass. at 355 (defendant's concern for sister not enough to tip balance where all other factors indicate that defendant made his statement voluntarily).

Id.

The Fifth Amendment provides, in relevant part, "No person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. In order to protect this privilege, the Supreme Court has held that, prior to a custodial interrogation, law enforcement officials must inform the person that:

he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Miranda v. Arizona, 384 U.S. 436, 478-79 (1966). "After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." Id. at 479.

The inquiry concerning whether Miranda rights have been waived "voluntarily, knowingly and intelligently" has two distinct dimensions:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.

<u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) (internal quotation omitted). A range of factors have been considered in assessing the totality of the circumstances surrounding an interrogation, including "the youth of the accused; his lack of education; or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973) (internal citations omitted). "[O]nly confessions procured by *coercive official tactics* should be excluded as involuntary." <u>United States v. Byram</u>, 145 F.3d 405, 407 (1st Cir. 1998) (emphasis in original).

A claim that a petitioner's statement was coerced involves mixed questions of law and fact under the AEDPA standard of review. The ultimate conclusion of a state court that a confession was voluntary constitutes a legal issue that requires an independent federal determination. <u>Miller v. Fenton</u>, 474 U.S. 104, 110 (1985). Thus, under the AEDPA habeas standard, the Court must determine whether the state court's legal determination of voluntariness was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). However, the factual findings underlying the state court's conclusion on the mixed issue are accorded a presumption of correctness. <u>Id.</u> § 2254(e)(1).

If a court finds that a statement was involuntary, the subsequent inquiry is whether its admission at trial constituted harmless error. <u>Arizona v. Fulminante</u>, 499 U.S. 279, 311 (1991). In

habeas cases, error is harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993), quoted in Wright v Marshall, 656 F.3d 102, 108 (1st Cir. 2011). "The burden of establishing harmlessness rests with the state qua respondent." Foxworth v. St. Amand, 570 F.3d 414, 436 (1st Cir. 2009). "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect in determining the jury's verdict,' that error is not harmless." O'Neal v. McAninch, 513 U.S. 432, 436 (1995).

The Appeals Court relied on the totality of the circumstances test when it examined whether Cooper's will was overborne. Thus, its ruling was not contrary to Supreme Court precedent establishing the appropriate test for voluntariness. Nor was the Appeals Court's ruling an unreasonable application of clearly established Supreme Court precedent.

The Supreme Court has twice addressed the admissibility of statements extracted through threats or promises relating to a suspect's children. In Haynes v. Washington, 373 U.S. 503, 504 (1963), the petitioner contended that his confession was involuntary when his requests to call his wife were refused and he was told that he would not be allowed to call her unless and until he cooperated with police and gave them a written and signed confession. Reviewing the totality of the circumstances, the Court found that the written confession was coerced and involuntary where the police obtained it through "the express threat of continued incommunicado detention" if the petitioner did not confess and "the promise of communication with and access to family" if the petitioner did confess. Id. at 514. In Lynum v. Illinois, 372 U.S. 528, 534 (1963), the Supreme Court held that the petitioner's confession, which was made only after the police had told her that state financial aid for her infant children would be cut off and her children taken from her if she did

not "cooperate," was "not voluntary, but coerced."

Courts considering the effect of leveraging a suspect's familial relationships on the voluntariness of that suspect's statements have not unanimously concluded that Haynes and Lynum compel a per se rule that exploiting an accused's relationships to induce cooperation renders the resulting confession involuntary. See Brown v. Horell, 644 F.3d 969, 982 (9th Cir. 2011) (citing cases), cert. denied, 181 L. Ed. 2d 435 (2011). Instead of viewing threats or promises related to one's family as warranting special caution, these courts have held that these threats and promises may be considered as part of the totality of the circumstances. Id.; see United States v. Jackson, 918 F.2d 236, 242 (1st Cir. 1990) ("The Congress and the courts have indicated that to determine voluntariness it is necessary to look at the totality of the circumstances, including any promises or threats made by police officers or the prosecution, in order to see whether the will of the accused was overborne.").

Here, the Appeals Court found that the detective's statement concerning Cooper's son did not render Cooper's statement involuntary in light of the fact that Cooper received three Miranda warnings prior to talking with the detective, acted normally and calmly, and was a seasoned career criminal unlikely to succumb to fear and intimidation. The Appeals Court's evaluation of these circumstances was not such that this Court can find that there is no possibility that "fairminded jurists could disagree" on the correctness of its decision. Harrington v. Richter, 131 S. Ct. 770, 786 (2011); see Jackson, 918 F.2d at 242 (holding totality of the circumstances, particularly defendant's experience with criminal justice system, indicated defendant's statement was voluntary notwithstanding the fact that the police informed defendant that his sister had been arrested and may have made an implied promise that she would be spared harm); United States v. Charlton, 565 F.2d

86, 89 (6th Cir. 1977) (father's confession to protect son who had been arrested not coerced where father was informed of his constitutional rights and obviously understood them, was not an impressionable youth, endured no lengthy detention, and was not lacking in intelligence).

Cooper cites Rogers v. Richmond, 365 U.S. 534 (1961), in support of his argument that the Massachusetts courts improperly relied on the fact that his statement was self-exonerating in determining that his statement was voluntary. In Rogers, the Supreme Court stated that the proper test for admissibility of statements should be focused "on the question whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined – a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth." Id. at 544. In Jackson v. Denno, 378 U.S. 368, 384-85 (1964), the Supreme Court explained the holding of Rogers, stating "that the reliability of a confession has nothing to do with its voluntariness – proof that a defendant committed the act with which he was charged and to which he has confessed is not to be considered when deciding whether a defendant's will has been overborne." The Massachusetts courts did not run afoul of the holding of Rogers. The courts did not consider whether Cooper had in fact been with Parker on the night of the incident; rather the courts looked at whether Cooper's statement was in his best-interest without regard to its reliability.

Even assuming that Petitioner has met his burden to show that his statement was involuntary, the Court finds that the Respondent has met her burden of establishing that any error was harmless. Cooper had been identified by the victim in the case, his car was found in the area of the break-in with the victim's checkbook and her portfolio case inside, and he stipulated that DNA taken from a hat identified by the victim as worn by the intruder and found inside the car matched his DNA.

Additionally, the statement was discussed only briefly in summation. (S.A. 1138-43). Accordingly, the introduction of Cooper's statement fails to place the integrity of the verdict against him in doubt. See Brecht, 507 U.S. at 639 (finding harmlessness in part, because the "state's evidence of guilt was, if not overwhelming, certainly weighty.").

D.     Ineffective Assistance of Counsel

Cooper claims his trial counsel was ineffective in failing to move to suppress recorded jail house telephone calls he made. MCI Concord shared these calls with the Hingham Police without any subpoena or legally authorized request allegedly in violation of the MCI Concord's phone policy and the Massachusetts Wiretap Statute. (Docket No. 2 at 15-16). Hingham Police went to MCI Concord, listened to certain calls Cooper made, obtained recordings of the calls, and played the calls at trial. Although trial counsel fought the admission of the calls into evidence, he did not move to suppress the calls as obtained in violation of the Massachusetts Wiretap statute because he did not believe that theory would succeed.

The Appeals Court rejected the ineffective assistance claim. It ruled that "[b]ecause the circumstances for [Cooper's] motion to suppress do not fall within the statute's enumerated list of exceptions [footnote omitted], and the recorded call also complies with Department of Correction's regulations, filing such a motion would have been futile." Cooper, 2007 WL 45711788, at *5. Cooper asserts that, although the Appeals Court identified the correct legal standard as set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), the Appeals Court unreasonably applied it to the facts of his case. (Docket No. 2 at 17).

To succeed on a Sixth Amendment ineffective assistance of counsel claim, a habeas petitioner "must establish that (1) 'counsel's representation fell below an objective standard of

reasonableness,' and (2) 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" <u>Smiley v. Maloney</u>, 422 F.3d 17, 20 (1st Cir. 2005) (quoting <u>Strickland</u>, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694. A failure of proof on either prong defeats an ineffective assistance of counsel claim. <u>See</u> <u>Malone v. Clarke</u>, 536 F.3d 54, 64 (1st Cir. 2008) ("[I]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.") (internal quotation omitted). The burden is on the Petitioner to demonstrate both deficient performance by his counsel and prejudice by a preponderance of the evidence. <u>See</u> <u>Lema v. United States</u>, 987 F.2d 48, 51 (1st Cir. 1993). By definition, counsel's performance was not deficient in failing to file a "futile," <u>Cooper</u>, 2007 WL 45711788, at *5, motion to suppress. Accordingly, the ineffective assistance claim fails.

## IV.     CONCLUSION

For the foregoing reasons, (1) I DENY the Motion for Hearing on the Petition (Docket No. 23) without prejudice to its renewal before the district judge and (2) I recommend that the Court DENY the Petitioner Anthony Cooper's Petition for Writ of Habeas Corpus (Docket # 1).[8]

/s/ Leo T. Sorokin
LEO T. SOROKIN
United States Magistrate Judge

---

[8] The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation. The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).